**Opinion issued June 25, 2015.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-14-00175-CV

———————————

**RYAN COLTER, Appellant**

**V.**

**AMKIN TECHNOLOGIES, L.L.C., Appellee**

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-35412**

---

## MEMORANDUM OPINION

The underlying action arises out of a breach-of-contract case brought by appellant, Ryan Colter, against his former employer, Amkin Technologies, L.L.C., for unpaid sales commissions. After the jury found against Colter regarding the existence of such an agreement and the trial court entered a take-nothing judgment

on his breach-of-contract claims, Colter appealed, contending that the jury's "no" answer regarding the existence of an agreement to is so against the great weight and preponderance of the evidence as to be manifestly unjust. We affirm.

## BACKGROUND

The dispute in this case is whether Amkin Technologies, L.L.C. agreed to pay pay Ryan Colter a 3% commission on all his sales, whether the agreement provided that Amkin could utilize its discretion in determining the amount of Colter's commission with 3% being the ceiling, or whether the parties reached any agreement at all regarding Colter's commissions

Amkin is in the business of selling portable drilling rigs. Amkin hired Colter in May 2008 as its sales director. Colter interviewed for the job with David Camp ("Camp"), Amkin's president and one of its owners. After the interview, Camp sent Colter a letter offering him the job in exchange for a salary of $4,000 per month, plus a commission structure. Camp's offer letter stated the commission structure would be provided later in detail. Colter testified that right after he was hired, "[Camp] and I had a conversation that my commission was going to be based off the letter. The $4,000 a month plus a 3% commission on sales I was involved with." In contrast, when asked whether he had any verbal agreement to pay Colter a 3% commission no matter what work he did or how he was involved with a project, Camp replied, "No. No. I never would have agreed to that. I mean

2

based on prior history and things that I'd done with other sales groups, that is not something I could agree to." No written agreement formalizing the commission structure was ever executed.

Colter accepted Amkin's offer and soon started work without a written commission structure in place. Colter testified that he started work without knowing the terms, conditions, or amount of the commissions he would be paid.

Colter's tenure at Amkin was divided into two periods: (1) he was the sales director between May 2008 and February 5, 2010 and (2) he was the company's project manager and in charge of inside sales from February 5, 2010 until he was fired on January 27, 2011.

*The Sales Director Period*

The first commission Colter received was for the Potter transaction, and it involved the sale of a drilling rig. On the rig sale to Potter, Amkin did not keep the full $661,000 it received from the sale because it shared some of it with the rig's original purchaser, but it nonetheless paid Colter 3% of the entire sale proceeds. Subsequent to the rig sale to Potter, Amkin also paid Colter a 3% commission on his sales of various spare parts to Potter. Later, during his tenure as the sales director, Colter sold a drilling rig to another customer known as Sandia, and Amkin paid him a 3% commission on that sale too.

However, another rig sold by Amkin during Colter's tenure as sales director was the SST rig. The parties dispute whether Colter was involved in the sale of the SST rig. Camp testified Colter was involved in the sale of the SST rig, while Colter testified he did not have anything to do with the SST rig sale and was only involved with SST after the rig sale. Both parties, however, agree that Colter never sought any commission from the sale of the SST rig, nor complained about the lack of payment of any commission from the sale of the rig to SST; and both parties agree that Colter was involved in the sale of spare parts to SST, and that Amkin paid him a 3% commission on the sale of those spare parts.

Camp also testified about a transaction with Drill Steam for which Colter did not receive any commission. Colter testified that Amkin did not sell anything to Drill Steam, but merely rented some space from Amkin to work on its own projects, so he never sought a commission related to Drill Steam.

*The Project Manager/Inside Sales Period*

In February 2010, Amkin asked Colter to change jobs from sales director to project manager and inside sales. Amkin felt that Colter would be more effective working on inside leads that came in to the business rather than creating new business through outside sales. The job change involved a change in Colter's compensation structure—including the potential for bonus compensation and a 1.5% commission on sales, the payment of which was documented as being subject

to management discretion in several respects (referred to as the "February 2010 Contract").

Colter testified that he and Camp discussed the commission structure that would be applied to potential sales in Colter's "pipeline," which the parties describe as potential sales that had been initiated by Colter when he was the Sales Director, but might not come to fruition until after he changed jobs. Colter testified that he and Camp agreed that Amkin would pay Colter 3% commission on any "pipeline" sales. Camp remembered no such discussion. Instead, when asked about any agreement reached when Colter changed jobs, Camp testified, "I don't have a signed agreement between the two of us that dictates the specific term other than the fact that as we operated for the course of that year and a half there were times when [Colter] got a maximum percentage and sometimes he didn't get a percentage." Camp testified that his understanding of Colter's pre-February 2010 commission agreement was that it was based on the company's discretion up to a maximum of 3%. He said that "[t]he way in which we worked the commission [before the 2010 contract] was effectively the same prior to not having a contract."

After Colter changed jobs, Amkin paid him a 3% commission on the sale of the Eskom rig. Amkin then failed to pay Colter a 3% commission on the sale of a rig to Linc, one of the four transactions at issue in this case. Instead, Amkin paid Colter a .25% commission on Linc. Colter did not complain about the non-

payment of the 3% commission on the Linc rig sale and continued working for Amkin.

Thereafter, in October 2010, Amkin advised Colter it intended to pay him less than 3% on four other transactions involving parts sold to existing customers. This time, Colter did complain to Camp about Amkin's failure to pay him 3% on these other transactions. Amkin responded by paying Colter the 3% commission on these four transactions.

*Colter's Termination*

Amkin terminated Colter on January 27, 2011. Camp testified that he was unsatisfied with Colter's productivity. At that time, Amkin advised Colter he would not receive a 3% commission on the WKK and Pol Tex rig sales or on the sale of parts and services to Sandia under the final billing of that project. Instead, Amkin would pay Colter 2.25% on the WKK rig sale, 2.25% on the Pol-Tex rig sale, and 1.5% on the Sandia parts sale. These are the other three transactions that, in addition to the sale of the Linc rig, for which Colter received a .25% commission, that make up the basis of Colter's lawsuit.

## DISCUSSION

At trial the jury was asked the following:

> Did Amkin Technologies LLC and Ryan Colter agree that Amkin Technologies LLC would pay Ryan Colter a salary plus 3% commission on sales initiated when Ryan Colter was sales director for Amkin Technologies LLC from May 20, 2008, to February 5, 2010?

6

In deciding whether the parties reached an agreement, you may consider what they said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions.

Answer "Yes" or "No"

Answer: NO

In his sole issue on appeal, Colter contends "the jury's 'no' answer regarding the existence of an agreement to pay a 3% commission is so against the great weight and preponderance of the evidence as to be manifestly unjust[.]"

*Standard of Review*

When the party having the burden of proof attacks the factual sufficiency of an adverse finding from the trial court, he must demonstrate on appeal that the jury's finding was against the great weight and preponderance of the evidence. *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). We must consider and weigh all of the evidence in order to conduct a proper factual sufficiency review. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001). We may set aside the verdict only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

*Sufficiency of the Evidence Analysis*

To prove his case at trial, Colter was required to show by a preponderance of the evidence that the parties had an agreement that Amkin would pay Colter a

7

commission of "3% on sales initiated when [he] was sales director for [Amkin] . . . ."

It was undisputed at trial that there was no written or executed document detailing the terms and conditions of a commission structure, either at the time he was hired or for transactions that began while he was sales director but culminated after his move to inside sales.

Colter's case at trial rested on the testimony of two fact witnesses, himself and Camp, along with circumstantial evidence of various business projects where sometimes Colter received a 3% commission and other times he received no commission or less than 3%.

At trial, Colter contended that he and Camp discussed a 3% commission, but Camp testified at trial that he remembered no such discussion. The jury was entitled to resolve this dispute in the evidence against Colter. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) ("The jury is the sole judge of the credibility of the witnesses and the weight to be given to [the witness's] testimony.") Camp also testified that, while Amkin never "gave [Colter] a single piece of paper prior to the time [it] asked him to change jobs" indicating that the commissions were subject to its discretion, there was nonetheless evidence that the parties agreed to such management discretion, as evidenced by their history on other projects for which Colter was not paid a full 3% commission.

8

Specifically, Camp pointed out that Amkin did not pay Colter a commission on the SST rig during his tenure as sales director, even though he was involved in its sale. While Colter disputed his involvement in the sale, again, the jury was entitled to believe Camp and not Colter. *See id*. And, after Colter moved into his new position, Amkin did not pay him a full commission on the Linc rig, but he was instead paid only .25%, an amount to which Colter did not object. Colter testified that the parties had agreed to a 3% sales commission shortly after he was hired, but Camp testified that he would never have agreed to such a commission structure, and that the 3% was a cap, with the company having the right to adjust the percentage based on the profitability to the company and Colter's level of involvement.

The facts established by both disputed testimonial evidence and payment history permitted the jury to conclude that Colter had failed to meet his burden of proving by a preponderance of the evidence that there was an agreement that he was to receive a 3% commission on all projects and sales. The jury could reasonably have concluded that there was never a "meeting of the minds" as to the commission structure in effect before the February 2010 contract or whether such a structure, if any, applied to all sales initiated, but not concluded until after Colter's job switch. As such, the jury's negative finding is not against the great weight and

9

preponderance of the evidence. *See Croucher*, 660 S.W.2d at 58; *see also Dow Chem. Co.*, 46 S.W.3d at 242.

We overrule Colter's sole issue on appeal.

## CONCLUSION

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Massengale.